935 P.2d 844

**ARIZONA HEALTH CARE COST CONTAINMENT SYSTEM ADMINISTRATION, an agency of the State of Arizona; and Leonard D. Kirschner, M.D., in his capacity as director of AHCCCS, Appellants,**

v.

**CARONDELET HEALTH SYSTEM, an Arizona corporation d/b/a St. Mary's Hospital and Health Care Center, Appellee.**

Nos. 1 CA–CV 93–0175, 1 CA–CV 93–0335.

Court of Appeals of Arizona, Division 1, Department D.

July 23, 1996.

Reconsideration Denied Oct. 18, 1996.

Review Denied April 29, 1997.

Johnston Maynard Grant & Parker by Catherine M. Dodd, Anne C. Longo, Phoenix, for Defendants/Appellants.

Gammage & Burnham by Richard B. Burnham, Cameron C. Artigue, Stephen W. Anderson, Phoenix, for Plaintiff/Appellee.

OPINION

PATTERSON, Judge.

Arizona Health Care Cost Containment System Administration ("AHCCCS") denied a claim filed by Carondelet Health Services ("Carondelet") for services provided to the AHCCCS eligible patients involved in this appeal. AHCCCS denied the claim because it concluded that the patients did not meet the statutory or regulatory requirements for "emergency" services. The superior court reversed the administrative decision. For the following reasons, we affirm the superior court.

## I. FACTS AND PROCEDURAL HISTORY

This is a consolidated case which involves the medical treatment of two patients by St. Mary's Hospital. Both patients upon arrival in St. Mary's emergency room were evaluated, admitted, and treated on an inpatient basis. Neither patient was initially eligible for AHCCCS because their income exceeded the eligibility limitations set by AHCCCS. See Ariz.Rev.Stat. Ann. ("A.R.S.") § 36–2905(B). Each became eligible for AHCCCS through a "spend down" process in which incurred medical bills are subtracted from the patient's income until it meets the qualification limitations. See A.R.S. § 36–2901(4)(c); A.R.S. § 36–2905(E)(1).

After a patient is eligible for AHCCCS, he or she is enrolled with an AHCCCS prime contractor, which manages the patient's care in exchange for a "per member per month" capitated fee. See generally A.R.S. § 36–2904 (Supp.1995). There is a three-day period between the time a patient is determined eligible and is enrolled in a plan. The legislature has determined that during this "fee-

for-service window" the AHCCCS administration itself is responsible for the management and payment of the patient's "emergency services" pursuant to A.R.S. section 36–2908(E)(Supp.1995), which provides:

> Notwithstanding any provision of this chapter to the contrary, for persons certified as eligible pursuant to § 36–2901, paragraph 4, subdivision (a), (c) or (j) or pursuant to § 36–2905.03, subsection C, **only emergency medical services as defined by the director by rule which are delivered to persons who have been determined eligible but who have not yet enrolled in the system shall be reimbursed.** (Emphasis added.)

The Director of AHCCCS ("the director") defined the term "emergency medical services" as:

> [s]ervices provided after the sudden onset of a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:
>
> a. Placing the patient's health in serious jeopardy;
>
> b. Serious impairment to bodily functions; or
>
> c. Serious dysfunction of any bodily organ or part.

Arizona Administrative Code ("A.A.C.") R9–22–101(45) [1].

The specific facts pertaining to the treatment of each patient are as follows: On December 10, 1989 at 3:05 a.m., I.G.[2] arrived in the emergency room at St. Mary's Hospital with an abdominal abscess "the size of a grapefruit," and diabetes that was "out of control." The attending physician admitted I.G. for immediate treatment. Because her diabetes was unstable, the hospital first treated and stabilized that condition before proceeding with a surgical drain of the abscess.

I.G. was eligible for AHCCCS benefits for emergency coverage only from December 16 through December 19, 1989. AHCCCS denied St. Mary's claim because it determined that the services provided were non-emergent in nature. The hospital filed a grievance, and the director issued a decision concluding that the services were non-emergent. The director felt that I.G.'s medical condition was not the result of a "sudden onset" because she had symptoms for three to four weeks before her arrival at the emergency room.

On March 1, 1989, J.F., complaining of numbness throughout his extremities, was examined by Dr. Greenberg, who recommended that he seek hospital treatment. J.F., however, did not seek treatment until March 5, 1989, when he arrived at St. Mary's complaining of "severe numbness throughout his body." The hospital contacted Dr. Greenberg who diagnosed J.F. with a possible lesion somewhere in his central nervous system, either along his spinal cord or in his brain, and admitted him. On March 6, 1989, J.F. underwent an MRI scan, which confirmed the presence of a lesion along his spinal cord. J.F. underwent surgery on March 9 and was released on March 12.

J.F. was eligible for AHCCCS for emergency coverage only from March 5 through March 8, 1989. Initially, AHCCCS issued payment for March 5, 7, and 8, but denied payment for March 6. The hospital filed a grievance contesting the denial of payment. AHCCCS then conducted a review of all of the payments, denied the hospital's grievance and demanded a recoupment of its earlier payment. The director denied St. Mary's claim because he concluded that J.F.'s condition was not the result of a "sudden onset," and because the medical care could have been given on an out-patient basis.

St. Mary's appealed both decisions. The superior court determined that the director had abused his discretion because the evidence in both cases indicated that the patients' conditions were the result of a "sudden onset" of illnesses. AHCCCS timely appealed to this court. We have jurisdiction pursuant to A.R.S. section 12–2101.

---

1. Formerly A.A.C. R9–22–101(38).

2. Initials are used to protect the confidentiality of these patients.

## · II. DISCUSSION

AHCCCS first argues that the superior court applied an incorrect standard of review in reversing the administrative decision. Specifically, it contends that the superior court did not address the evidence or the factual findings of the director but instead substituted its judgment.

### A. Standard of Review

■ On appeal, the superior court and the court of appeals determine whether substantial evidence supports the administrative decision. *Havasu Heights Ranch and Dev. Corp. v. Desert Valley Wood Products, Inc.,* 167 Ariz. 383, 387, 807 P.2d 1119, 1123 (App. 1990). The reviewing court, however, conducts a *de novo* review of the administrative agency's application and interpretation of the law. *Eshelman v. Blubaum,* 114 Ariz. 376, 378, 560 P.2d 1283, 1285 (App.1977). The reviewing court therefore may substitute its judgment for the agency's conclusions regarding the legal effects of its factual findings. *Gardiner v. Arizona Dept. of Economic Security,* 127 Ariz. 603, 606, 623 P.2d 33, 36 (App.1980).

### B. Sufficiency of the Evidence

Here, AHCCCS asserts that the superior court was required to determine whether the director properly interpreted the term "emergency medical services," and whether there was substantial evidence to support the director's decision that neither of the patients required such services.

AHCCCS contends that the superior court committed reversible error by failing to give proper deference to the director's interpretation of his own rule. It submits that absent a clearly expressed legislative intention to the contrary, the language of a statute must ordinarily be regarded as conclusive, citing *Moorhead v. U.S.,* 774 F.2d 936, 940 (9th Cir.1985), and that A.R.S. section 36–2908(E) clearly authorizes the AHCCCS director to develop his own definition of emergency medical services, which the director did by enacting A.A.C. R9–22–101(45). According to AHCCCS, based on the clear language of the statute and the AHCCCS regulation, the

decision of the director was supported by substantial evidence.

St. Mary's responds that the director exceeded his authority under A.R.S. section 36–2909(H) in determining that the services provided by St. Mary's were inappropriate under the "sudden onset" rule. It submits that the director has created a sudden onset requirement that illegally restricts the legislature's extension of hospital coverage for medical emergencies, citing *Duncan v. A.R. Krull Co.,* 57 Ariz. 472, 476, 114 P.2d 888, 890 (1941).

■ Although the superior court concluded that the patients did suffer from a "sudden onset," St. Mary's asks this court to exercise its discretion and decide the appeal on the validity of the director's "sudden onset" rule, pursuant to Arizona Rules of Civil Appellate Procedure 13(b) (Supp.1995).

AHCCCS responds that this would lessen its rights or enlarge St. Mary's rights because the superior court did not decide the issue on the validity of the regulation. It contends that the issue is not properly before this court unless St. Mary's has cross-appealed pursuant to Rule 13(b)(3), which provides:

> The brief of the appellee may, without need for a cross-appeal, include in the statement of issues presented for review and in the argument any issue properly presented in the superior court. The appellate court may affirm the judgment based on any such grounds. The appellate court may direct that the judgment be · modified to enlarge the rights of the appellee or to lessen the rights of the appellant only if the appellee has cross-appealed seeking such relief.

The State Bar Committee Note to Rule 13(b)(3) recognizes that this rule now allows Arizona appellate courts to affirm on a ground that may enlarge an appellee's rights on appeal. It states that "essentially, no issues which could lead to the same practical result as that embodied in the judgment will be foreclosed by lack of a cross-appeal." Comment to Ariz. R. Civ.App. P. 13(b)(3). We therefore address St. Mary's argument because an affirmance on that basis would not alter the judgment.

### 1. I.G. Required Emergency Medical Services

The hearing officer determined that because I.G.'s abscess had been present for at least ten days, the medical condition was not the result of a "sudden onset;" and that I.G. therefore did not require emergency medical services. The director adopted the findings of the hearing officer and determined that they were supported by substantial evidence. The superior court, upon review, reversed and determined that:

> the AHCCCS administrative action was the result of abuse of discretion. The facts as presented, including the time of day of admission, support the conclusion that the admission of the patient was for an emergency and met the sudden onset requirement.

■ St. Mary's submits that because the administrative decision rests almost exclusively on the fact that I.G. had the abscess for ten days prior to the in-patient admission, the AHCCCS administration has created a sudden onset requirement which improperly restricts the legislature's intended scope of coverage for medical emergencies. We agree.

It is well settled that the regulations promulgated by an administrative agency must be consistent with the parameters of the statutory grant of authority. *E.g., Ference v. Kirschner,* 176 Ariz. 530, 532, 862 P.2d 903, 905 (App.1993) (citations omitted); *Boyce v. City of Scottsdale,* 157 Ariz. 265, 267, 756 P.2d 934, 936 (App.1988). The legislature has defined emergency medical care as "immediate medical care ... in order to preserve the person's health, life or limb." A.R.S. § 41–1831(7). Similarly, the Arizona Supreme Court, in defining emergency care, has noted that although there are various definitions "the need for immediate attention seems to be the common thread." *Thompson v. Sun City Community Hospital,* 141 Ariz. 597, 603, 688 P.2d 605, 611 (1984).

While the legislature has given AHCCCS the authority to define coverage of "emergency" medical services, it appears that the director is using the sudden onset requirement to draw a distinction between two classes of patients in need of emergency care: (1) trauma victims or those whose illnesses have had a very rapid onset; and (2) those who have suffered symptoms for a period of time before their conditions became critical. The effect of the "sudden onset" rule is to eliminate emergency medical coverage for an entire group of patients who would otherwise be covered. The director lacks statutory authority to do so. The regulation ignores the reality that degenerative diseases, at some point, become "emergent."

■ In the case of I.G., AHCCCS argues that the record clearly established that the hospital admission was neither unforeseen nor sudden because I.G. had been experiencing symptoms for ten days. Thus, AHCCCS maintains that the director was not authorized to reimburse St. Mary's because the services were non-emergent and not the result of a "sudden onset" of symptoms.

The fact that I.G. waited before going to the hospital does not address the urgency of her treatment upon arrival. The undisputed evidence established that the abscess was the size of a grapefruit and was well beyond the stage where conservative treatment could have been initiated. At the time of admission, I.G. required immediate attention because if the abscess had been left unattended, it could have ruptured and placed her health in serious jeopardy. The diabetic imbalance made immediate surgical treatment of the abscess impossible due to the risk of diabetic coma. Thus, the attending physician determined that I.G. would have to be admitted to the hospital, her diabetes brought under control, and the abscess treated presurgically before the surgical procedure could take place.

■ Because the record demonstrates that I.G. required emergency medical services, which AHCCCS did not contest with medical testimony, the superior court was correct in concluding that the director's decision was not supported by substantial evidence.

### 2. J.F. Required Emergency Medical Services

■ The hearing officer concluded that there was no dispute that J.F.'s "condition

was emergent and required admission." He rejected the argument that because J.F. was not confined to a bed; and that because the diagnostic tests could have been performed on an out-patient basis, J.F. did not require "in-patient" emergency medical care. The hearing officer determined that J.F. was at risk for a lesion rupture and possible paralysis and that these risks were significantly increased with mobility.

The director, upon review, rejected the hearing officer's recommendations. He determined that the medical care given to J.F. was non-emergent because it could have been given on an out-patient basis. He additionally concluded that J.F.'s condition was not the result of a "sudden onset" because J.F. had experienced symptoms for three to four weeks prior to hospitalization. The superior court determined that the record supported the decision of the hearing officer and that the decision of the director was contrary to the evidence.

At the administrative hearing, Beth Simon, a quality assurance utilization management specialist at St. Mary's, testified that J.F. was admitted because he was "presenting a neurological deficit that's gotten worse," and that Dr. Greenberg had ordered an MRI to rule out the possibility of a tumor. She stated that J.F.'s health was in serious jeopardy because "he was at risk of having a lesion rupture press harder on the spinal cord and creating a lot of neurological difficulty."

Dr. Greenberg immediately ordered several tests to help define J.F.'s medical problem. An MRI, which was done on March 6, indicated a large predominately left-sided posterior disc herniation at the level of C–6 and 7. When Dr. Greenberg received that result, he determined that J.F. needed surgery. He then ordered two pre-operative tests: a myelogram and a CT–Scan. Simon testified that the myelogram showed a "complete block," and that J.F. therefore was not getting any nerve conduction from where the blockage began.

The hearing officer then inquired about the potential risks associated with a blocked disc. Simon responded that they include muscle atrophy, probable incontinence and possible paraplegia. The hearing officer further inquired whether any of these risks could minimized through surgery, and Simon stated "possibly." She added that "[t]o send him home at that point with a disc herniation, you have the possibility of rupture, and I think the doctor would be highly at risk for doing that with that information...." She further testified that a blocked disc located high on the cervical spine, puts a patient at an increased risk.

AHCCCS does not dispute that the emergency room charges were appropriate or that J.F. needed to be evaluated by a doctor. Rather, AHCCCS contends that J.F. did not need to be admitted and treated as an inpatient. Essentially, AHCCCS submits that it was an emergency situation until the hospital diagnosed J.F.'s condition and ruled out a tumor.

That diagnosis, however, was dependent on the MRI results, which indicated that J.F. required surgery. Dr. Greenberg accordingly scheduled surgery and ordered further pre-surgical tests to more closely pinpoint the surgical area. St. Mary's has presented medical testimony which establishes a logical sequence of events that occurred within a relatively short period of time. AHCCCS, in response, does not refute the medical evidence presented by St. Mary's. In concluding that the admission was necessary, the hearing officer noted Beth Simon's testimony that if J.F. had been discharged, the attendant increased mobility escalated the possibility of rupture and paralysis. Again, AHCCCS offered no evidence to refute this testimony.

Given the short time between the necessary admission and the surgery, together with the risks attendant to the lesion, the trial court properly determined that the director abused his discretion in finding that J.F. did not require emergency care.

### III. CONCLUSION

Because the uncontroverted evidence at the administrative hearing indicates that I.G. and J.F. required immediate medical care, and because we find that the director's "sud-

272

den onset" rule is invalid, the decision of the trial court is affirmed.

GARBARINO and KLEINSCHMIDT, JJ., concur.